# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

VINCENT EVANOSKI,          )
                                   )
             Plaintiff,     )    Civil Action No. 2:12-cv-00211
          v.                   )
                                   )    Judge Mark R. Hornak
UNITED PARCEL SERVICE,   )
                                   )
            Defendant.    )

## OPINION

**Mark R. Hornak, United States District Judge**

Mr. Evanoski was a delivery truck driver for UPS for over twenty years, until after a series of incidents of accidents, late deliveries of packages, and route detours, his employment was terminated. He now sues his former employer, alleging unlawful discrimination under the Age Discrimination in Employment Act of 1969, as amended (ADEA), Title 29 U.S.C. § 621 *et seq.*

Currently before the Court is Defendant United Parcel Service's ("UPS") Motion for Summary Judgment, ECF No. 28. The Court has considered Plaintiff's Complaint, ECF No. 1, the pending Motion and Brief in Support, ECF No. 29, Plaintiff's Response in Opposition, ECF No. 36, Defendant's Reply Brief, ECF No. 41, and the accompanying exhibits. The Court's deliberations have also been materially aided by the oral argument presented by counsel on July 25, 2013. For the reasons that follow, Defendant's Motion is granted, and judgment is entered in Defendant's favor.

# I.    BACKGROUND

Mr. Evanoski was hired by UPS in 1984, in a part-time capacity, and in January 1991, became a full-time Package Car Driver.[1] Def.'s Concise Stmt. Mat. Facts ("CSMF") ¶ 9, ECF No. 30.  His duties included driving a UPS Package Car to deliver and pick up packages along an assigned route. *Id.* ¶ 4.  He was terminated on May 10, 2011, when he was forty-nine (49) years old. *Id.* ¶¶ 29, 42.  In the intervening years, Plaintiff was cited by UPS on multiple occasions for performance deficiencies. *See id.* ¶¶ 10, 19-30. Throughout that time, Plaintiff was a member of a union, and his relationship with his employer was governed by a Labor Agreement which, among other things, gave Plaintiff the right to challenge disciplinary actions against him through a grievance procedure. *Id.* ¶¶ 5-7.

## A.    <u>1992-2011 Incidents</u>

There is no indication that Plaintiff was involved in any disciplinary incidents until 1992, but between 1992 and 2010, Plaintiff was involved in no less than twelve. *Id.* ¶ 10; Pl.'s Resp. Def.'s Concise Stmt. Mat. Facts ¶ 10, ECF No. 10.  ("Pl.'s Resp. CSMF").  The first five of those twelve incidents can be summarized as follows:

| Incident Date | Particulars | Discipline | Plaintiff's Explanation |
|---|---|---|---|
| 3/6/1992 | Refusal to follow instructions | Warning Letter | Admitted |
| 6/6/1997 | Chargeable accident | Warning Letter | Admitted |
| 1/13/1998 | Left package car unattended/unlocked/motor running | Warning Letter | Admitted |
| 12/27/2000 | Missed 60 packages on delivery route | 2 Day Suspension | Admitted |
| 11/15/2001 | Improper conduct with customers in Ellwood City, PA | 5 Day Suspension | Admitted |

---

[1] The term "Package Car" refers to the seemingly ubiquitous UPS delivery vehicles. Def.'s CSMF ¶ 4.

Plaintiff does not offer any excuses or facts in his favor regarding those incidents. He was younger than forty (the beginning of the ADEA protected class age) at the time of all but the last incident above. *See* Pl.'s Resp. CSMF ¶ 10.

The next seven of twelve incidents are described in the record in greater detail. For a number of those incidents, Plaintiff challenged the disciplinary action through the grievance process, and the initial disciplinary actions against him were reduced in those instances as follows:

| Incident Date | Particulars | Initial Discipline | Post-Grievance Discipline | Plaintiff's Explanation |
|---|---|---|---|---|
| 9/24/2002 | Violence/stalking/ threatening | Discharge | Suspension without pay for 33 months; 1st Last Chance Agreement | The other driver involved in the violent altercation hit Plaintiff; Plaintiff did not hit back; other driver not disciplined |
| 12/6/2006 | Amount of "send-agains" and late delivery of air-packages | Warning Letter | N/A | Admitted |
| 6/4/2008 | Missed timely delivery of "Premium Packages" | Warning Letter | N/A | Defendant implemented new delivery service without instructing Plaintiff on its use |
| 12/5/2008 | Left delivery route - drove to his home to retrieve a puppy he started caring for, and brought puppy in his Package Car; did not clock out | 3 Day Suspension | N/A | Picking up the puppy took only a few minutes; puppy was abandoned; Plaintiff completed his duties afterwards |
| 4/30/2009 | Accident - struck cement pole in mall parking lot. Damage to Package Car, pole, and on-board device (DIAD) because | Discharge | Rescinded; 2nd Last Chance Agreement | Admitted |

| | Plaintiff wrongly kept it on his lap[2] | | | |
|---|---|---|---|---|
| 5/28/2009 | Twice failed to deliver Next Day Air packages | Discharge | Rescinded; 2nd Last Chance Agreement (grouped with 4/30/09 incident) | Packages had not been loaded in the delivery vehicle as was indicated in the DIAD; so many packages in truck Plaintiff unable to locate Next Day Air deliveries |
| 7/9/2010 | Forged customer signature on multiple packages, to make it appear as if they were delivered on time; complaint came from customer | Discharge | 60-day suspension; last chance warning | Customer had on multiple occasions before allowed Plaintiff to sign his name; denied he knew of the delivery deadline, due to a new service on which Plaintiff had not been instructed; mall route |

Def.'s CSMF ¶¶ 10, 13-18, 32-35; Pl.'s Resp. CSMF ¶¶ 10, 13-18, 32-35; ECF No. 31-7 at 14, 19. Plaintiff's second Last Chance Agreement dated 8/31/09 reads:

> It is understood that upon entering this agreement, I Vince Evanoski, agree to maintain an acceptable work record, including but not limited to, following all Company methods, procedures and instructions at all times and conducting myself as a 'model' employee working in the best interest of the Company at all times. Failure to maintain an acceptable work record will result in my immediate termination from UPS.

Def.'s CSMF ¶ 16; ECF No. 31-7 at 19. A hearing before the Western Pennsylvania Joint Council 40 Grievance Committee ("Grievance Panel") was held on August 31, 2010 regarding Plaintiff's discharge for the 7/9/10 incident. The third last chance warning issued on that date read: "This suspension will be considered a last and final warning from the Committee. Thus if there are any future failures to follow all methods, instructions and procedures immediate discharge shall result." *Id.* ¶ 18; ECF No. 31-7 at 23.

---

[2] Pursuant to company policy and the union contract, Mr. Evanoski continued to work while his grievance of the disciplinary action was pending regarding this and the other Discharge Notices. Def.'s CSMF ¶¶ 15, 22.

**B.**   **2011 Incidents and Plaintiff's Termination**

On January 20, 2011, Plaintiff was involved in an accident in which he backed his UPS truck into a customer's awning, causing damage to the awning. *Id.* ¶¶ 19, 36. Plaintiff admitted that he did not have his parking brake engaged at the time, though he argued his foot slipped off the brake and onto the gas, and that the failure to engage the parking brake would not have prevented the accident because he was intending to move the truck. Pl.'s Resp. CSMF ¶¶ 19, 36. Plaintiff's managers arrived at the scene and spoke with Plaintiff about the incident and the need to engage the parking brake. *Id.* ¶ 20. The next day, they observed Plaintiff again failing to engage the parking brake. *Id.* Plaintiff explains that he "was flustered as a result of the accident." Pl.'s Resp. CSMF ¶ 19. On February 4, 2011, Plaintiff received a Discharge Notice for that accident and his failure to use safe-driving methods at all times. *Id.* ¶ 21. While his grievance of that discharge was being processed, Plaintiff continued to work. *Id.* ¶ 22.

As was required after the accident, Chad Gordon, a supervisor at the UPS New Castle Business Center, conducted an on-the-job safety ride with Plaintiff on January 24, 2011. Id. ¶ 24. Mr. Gordon identified a number of safety concerns relating to Plaintiff's driving, including Plaintiff's failure to secure his seat belt before putting the vehicle into drive. *Id.* Another supervisor, Matt Warofka, also observed Plaintiff's driving on March 8, 2011; he observed Mr. Evanoski engaging in multiple "At Risk Behaviors": (1) leaving the bulkhead door open, (2) unnecessary backing, (3) park brake not engaged, (4) DIAD on lap, and (5) seat belt not on. *Id.* ¶ 25. These "At Risk Behaviors" led to another Discharge Notice on March 15, 2011. *Id.* ¶ 26. At a Local Level Hearing on April 19, 2011 regarding that discharge, Plaintiff responded in the following manner to the above five safety violations: (1) "I get lazy at the end of the day"; (2) "I

set the load up to delivery out of the back door"; (3) "I was pushed for time"; (4) "I'm not denying, I was cutting corners"; (5) "I'm not denying, I was cutting corners". *Id.* ¶ 38.

On May 10, 2011, a hearing was held before the UPS Western Pennsylvania Joint Council 40 Grievance Committee based on those two discharges (February 4 and March 15). The Grievance Panel, which was made up of an equal number of members from UPS and the Teamster Union, unanimously upheld the discharge, and Plaintiff's employment was terminated. *Id.* ¶¶ 7, 29-30.

Plaintiff had also been involved in another accident involving a bus that cracked the mirror in his Package Car, which Plaintiff did not report, on April 27, 2011. *Id.* ¶ 27. Mr. Evanoski does not deny that an incident occurred that resulted in his mirror breaking, but asserts that he had swerved to avoid an oncoming city transit bus and hit a telephone pole, that it was not "a reportable accident," and that in either event he did report it to a night manager, Mario Gabriel. Pl.'s Resp. CSMF ¶ 27. A letter from Mario Gabriel to Chad Gordon, Plaintiff's supervisor, on April 27, 2011 stated that on that date, a car wash assistant reported to Mr. Gabriel that Mr. Evanoski had scratches on his truck and was looking for extra mirrors, but that Mr. Evanoski never reported this accident to Mr. Gabriel. ECF No. 31-7 at 32.

Mr. Evanoski also asserts that on the day after this accident, Mr. Gordon confronted him and accused him of colliding with a school bus, pointing out a strip of yellow paint on the Package Car, and then yelling at Plaintiff and calling him a liar when he denied it. *Id.* ¶ 29. Mr. Evanoski asserts that he never collided with a bus, that the bus he swerved to miss was blue, silver, and white, and believes that the yellow paint was a set-up. *Id.* It was never discovered where the yellow paint strip came from. Pl.'s CSMF ¶ 60, ECF No. 39. This accident, and Plaintiff's failure to report it, resulted in Plaintiff receiving a Discharge Notice on April 29, 2011

(his third in 2011 and his seventh overall). Def.'s CSMF ¶ 28. The Discharge Notice states, "[y]ou are well aware of your responsibility to report any and all accidents, no matter how extensive or minimal the damage may be, however, you failed to do so." ECF No. 31-7 at 29. However, because the Grievance Panel on May 10 had already upheld Plaintiff's prior two discharges (February 4 and March 8), there was no need for it to hear or determine Plaintiff's grievance relating to the April 27 ("yellow paint") incident. Def.'s CSMF ¶ 30.

## C. Assignment of Routes During and After Mr. Evanoski's Employment

After Plaintiff's employment was terminated, his route was taken over by Joe DiGregorio, who was approximately forty (40) years old at the time, about ten years younger than Plaintiff. *Id.* ¶ 45. Under the Labor Agreement, Package Car Drivers bid on routes according to their seniority alone. Mr. DiGregorio won the bid for Plaintiff's route based on that seniority (as the individual with the highest seniority who did not already have a bid route at the time). *Id.* ¶¶ 44-45; Pl.'s Resp. CSMF ¶ 43.

At least since July 2010, Mr. Evanoski was assigned to the "24B route," covering downtown Sharon, Pennsylvania. Pl.'s Stmt. Add'l Mat. Facts ¶ 51, ECF No. 43 ("Pl.'s CSMF"). However, on at least a number of other occasions, Plaintiff was instructed to drive the "25A route" instead, which covered the Shenango Valley Mall ("Mall"); Plaintiff's incidents on 7/9/10, 1/20/11, and 3/8/11 occurred while driving that route. *Id.* ¶¶ 54-56, 58. Another Package Car Driver, Richard Hoffman, described the 25A as "a very tough route to run . . . . it ain't like another route, I don't think." *Id.* ¶ 53. He also testified, however that, the 25A is "a training route where you can put somebody new on it too, because there's not as many streets to know on it . . . because you're right there at the Mall and you have like two other roads to deliver . . . but it's a hustle-bustle route." D's Resp. CSMF ¶ 53, ECF No. 43. Another driver, Justin Barbati,

7

also testified that "training routes are more difficult regular routes," though he did not comment specifically on the 25A and 24B routes. *Id.* ¶ 52. Mr. Evanoski's argument attributes at least some of his performance incidents to "the distractions of a strange route." Pl.'s CSMF ¶ 57.

Mr. DiGregorio testified that after being assigned the 24B route, he was also told to do the Mall route on certain days, but it had last happened "within the last few weeks, month." DiGregorio Dep. 15:9, Oct. 22, 2012, ECF No. 40-5. Notably, no record evidence discusses (even roughly) how often Mr. Evanoski performed the Mall route instead of his bid-upon route. Mr. Gordon testified that the reason Mr. Evanoski covered the Mall route "could be a coverage reason," or for "safety." Gordon Dep. 20:23-21:5, Oct. 22, 2012, ECF No. 40-2; *see also* Clark Dep. 17:20 ("there could be different reasons; staffing. I don't know."). Mr. Gordon also identified three other individuals who were assigned to routes other than their bid routes; two of them were assigned to training routes, and the third replaced another driver when that driver was on vacation or was sick. Pl.'s CSMF ¶ 59.

### D.    Statistics relating to New Castle Center

Defendants also have offered statistical information relating to the demographics of the employees at the New Castle Business Center. At the time of Plaintiff's termination, 11 of the New Castle Center's 38 package drivers were older than Plaintiff, and 28 were over the age of forty. Def.'s CSMF ¶¶ 39, 40. The only two Package Car Drivers at the New Castle Center who had been involuntarily terminated in the five years prior to Plaintiff's termination were ages 28 and 32. *Id.* ¶ 41.

## II.    PROCEDURAL HISTORY

After exhausting his administrative remedies, Mr. Evanoski filed suit in this Court on February 22, 2012, alleging that UPS unlawfully terminated him on the basis of his age, in

violation of the ADEA, Title 29 U.S.C. § 621 *et seq*, and the Pennsylvania Human Rights Act, 43 Pa. Cons. Stat. § 955(a), ("PHRA"). ECF No. 1.[3] Defendant now moves for summary judgment pursuant to Fed. R. Civ. P. 56, asserting that it is entitled to judgment as a matter of law because (1) Plaintiff cannot make out a prima facie case of discrimination, and (2) Plaintiff has not advanced evidence sufficient for a jury to conclude that UPS's proffered reasons for terminating him were pretextual.

## III.    DISCUSSION

### A.    Standard of Review

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986). "In considering a motion for summary judgment, a court must draw all reasonable inferences from the underlying facts in the light most favorable to the non-moving party." *Emerson Radio Corp. v. Orion Sales, Inc.*, 253 F.3d 159, 162 (3d Cir. 2001). "When there is a disagreement about the facts or the proper inferences to be drawn from them, a trial is required to resolve the conflicting versions of the parties." *Am. Eagle Outfitters v. Lyle & Scott Ltd.*, 584 F.3d 575, 581 (3d Cir. 2009) (internal quotation and marks omitted).

### B.    *McDonnell Douglas* **Framework**

The ADEA makes it "unlawful for an employer . . . to discharge any individual . . . because of such individual's age." 29 U.S.C. § 623(a)(1).  Because Mr. Evanoski has not

---

[3] "[T]he PHRA is to be interpreted as identical to federal anti-discrimination laws except where there is something specifically different in its language requiring that it be treated differently." *Fasold v. Justice*, 409 F.3d 178, 184 n.8 (3d Cir. 2005). Here, as in *Fasold*, "[t]he PHRA provisions here at issue contain no such language; therefore, [the Court] will interpret the implicated provisions of the ADEA and PHRA as applying identically in this case and as being governed by the same set of decisional law." *Id.*

provided direct evidence of discrimination, the relevant inquiry is governed by the familiar three-part framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Burton v. Teleflex Inc.*, 707 F.3d 417, 425 (3d Cir. 2013). First,

> [t]o establish a prima facie case of age discrimination under the ADEA, Burton must make a showing that: (1) []he is forty years of age or older; (2) the defendant took an adverse employment action against [him]; (3) []he was qualified for the position in question; and (4) []he was ultimately replaced by another employee who was sufficiently younger to support an inference of discriminatory animus.

*Burton*, 707 F.3d at 426 (citing *Smith v. City of Allentown*, 589 F.3d 684, 689 (3d Cir. 2009)). In establishing a prima facie case at the summary judgment stage, "'the evidence must be sufficient to convince a reasonable factfinder to find all of the elements of the prima facie case.'" *Id.* (quoting *Duffy v. Paper Magic Grp.*, 265 F.3d 163, 167 (3d Cir. 2001)) (internal marks omitted).

Once the plaintiff makes out his prima facie case, "'the burden of production then shifts to the defendant to offer a legitimate non-discriminatory justification for the adverse employment action.'" *Id.* (quoting *Smith*, 589 F.3d at 690) (internal marks omitted). This burden is "relatively light." *Id.*

> The third step in the McDonnell Douglas analysis shifts the burden of production back to the plaintiff to provide evidence from which a factfinder could reasonably infer that the employer's proffered justification is merely a pretext for discrimination. . . . To make a showing of pretext, 'the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.'

*Id.* at 427 (quoting *Fuentes v. Perskie*, 32 F.3d 759, 764-65 (3d Cir. 1994)). Regardless of whether the Plaintiff proceeds under prong (1) or (2) of *Fuentes* to establish pretext, "the plaintiff's evidence must allow a reasonable jury to find, by a preponderance of the evidence, that age discrimination was a 'but-for' cause for the adverse employment action." *Wareham v. Dollar Bank*, --- F. Supp. 2d ---, CIV.A. 11-326, 2013 WL 1336247, at *8 (W.D. Pa. Mar. 29,

2013) (internal quotation omitted) (citing *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177-78 (2009)).

## C.    Prima Facie Case

UPS first argues that Mr. Evanoski cannot make out a prima facie case of age discrimination because (1) Plaintiff was not "qualified" for his position at the time of termination, and (2) Plaintiff has not demonstrated that he was "replaced" by someone sufficiently younger, nor pointed to other facts sufficient to give rise to an inference of age discrimination. Def.'s Br. Support Mot. S.J. 11-17, ECF No. 29.

According to UPS, Mr. Evanoski was not "qualified" for his position because he did not meet his employer's "legitimate business expectations" by his engaging in a series of incidents of misconduct. *Id.* (citing *Meade v. Kroger Ltd. P'ship I*, 858 F. Supp. 2d 977, 988-89 (N.D. Ind. 2012)). However, UPS does not point to, nor has this Court found, any legal authority from the Third Circuit supporting a "legitimate business expectations" requirement as part of the prima facie case. *Cf. Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 790 (7th Cir. 2007) ("meeting legitimate business expectations" is prong of prima facie case). In this Circuit, although an employee must show that he is "qualified" for the position from which he is terminated in making out a prima facie case, *see Burton*, 707 F.3d at 426, where an employee possesses "the background qualifications for the position for which he was hired," but the employer alleges that the employee's conduct did not "possess subjective qualities" desirable to the employer, the employee's failure to meet those expectations is "more appropriately considered at the second stage of the [*McDonnell Douglas*] analysis." *Hugh v. Butler Cnty. Family YMCA*, 418 F.3d 265, 268 (3d Cir. 2005) (citing *Weldon v. Kraft, Inc.*, 896 F.2d 793 (3d Cir. 1990)). Prior to his termination, Plaintiff had been a Package Car Driver for UPS for over twenty years; Defendant

does not point to any way in which Plaintiff was objectively unqualified (i.e. lacking in education or experience) for that position. *See id*; *Keller v. Orix Credit Alliance, Inc.*, 130 F.3d 1101, 1122 (3d Cir. 1997) ("In reviewing qualifications, we must only look to objective criteria, such as [plaintiff's] education and experience."). Therefore, Plaintiff is able to establish the third prong of his prima facie case.

UPS's attack on the third prong of Mr. Evanoski's prima facie case is followed by its attack on the fourth. UPS argues that because Mr. DiGregorio, the younger employee who took over Plaintiff's route upon his termination, received that route as the result of a non-discretionary bidding process according to his seniority, he did not "replace" Mr. Evanoski in a manner sufficient to give rise to an inference of age discrimination.

In *Pivirotto v. Innovative Sys., Inc.*, 191 F.3d 344, 357 (3d Cir. 1999), the Third Circuit explained,

> When actually focusing on the prima facie case, we have repeatedly emphasized that the requirements of the prima facie case are flexible, and in particular that "the fourth element must be relaxed in certain circumstances, as when there is a reduction in force." *Torre v. Casio, Inc.*, 42 F.3d 825, 831 (3d Cir.1994). . . . [However,] we have never held that the fourth element of the prima facie case should be relaxed *only* when there is a reduction in force.

*Id.* In *Pivirotto*, the court held that where "an existing male employee assumed [the plaintiff's] duties after she was fired," even though "there was no evidence that [the plaintiff] was 'replaced' by a man," the plaintiff had satisfied the fourth prong. *Id.* And more generally, a Plaintiff may meet the fourth prong by showing he was "fired from [a position] under circumstances that give rise to an inference of unlawful discrimination." *Id.* (quoting *Waldron v. SL Indus., Inc.*, 56 F.3d 491, 494 (3d Cir. 1995)); *see also Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 798 n.7 (3d Cir. 2003) (citing *id*).

Defendant does not miss the mark in arguing that the fact that Mr. DiGregorio (a substantially younger employee) assumed the bid route formerly conducted by Mr. Evanoski pursuant to a non-discretionary bidding process dictated by the Labor Agreement, rather than by the unfettered choice of a UPS decisionmaker, makes it overall far less likely that that "replacement" is any evidence of age discrimination. But even so, given the Third Circuit's flexibility in applying the fourth prong, it would be erroneous for that alone to render Plaintiff's prima facie case dead in the water. For one thing, Plaintiff argues that although UPS could not control the bidding process, it knew which employee was likely next in line to replace Mr. Evanoski. While this is alleged institutional knowledge not supported by any direct evidence,[4] it is plausible and could be inferred from a "Seniority Report" of the only 38 employees at the New Castle Center, to which one of Plaintiff's Supervisors, Joseph Clark, testified he had access. ECF No. 40-2 at 20; Joseph P. Clark Dep. 18:7-13, Oct. 22, 2012, ECF No. 40-4. Even under this system, therefore, it is at least theoretically possible that Mr. Evanoski could have "lost out because of his age." *Pivirotto*, 191 F.3d at 355 (quoting *O'Connor v. Consolidated Coin Caterers Corp.,* 517 U.S. 308, 312 (1996)). Based on this evidence, as in *Torre*, "[t]he inference in age discrimination may not be overpowering, but [the Court] cannot say that, as a matter of law, it is insufficient." 42 F.3d at 831-32.[5] Therefore, while it is a very close call, Plaintiff has adequately stated a prima facie claim of age discrimination.

---

[4] Another Package Car Driver, Mr. Hoffman, asserted his belief that UPS supervisors could have easily discerned from the seniority report who was the next employee in line to bid on a route. Richard Hoffman Dep. 34-35, Jan. 16, 2013, ECF No. 40-3.

[5] The Court therefore will analyze any other circumstances of Mr. Evanoski's termination that may give rise to an inference of discrimination in its analysis of pretext.

## D.  Pretext

Plaintiff does not contend that UPS cannot met its light burden of advancing a legitimate nondiscriminatory reason for Plaintiff's termination at step two of the *McDonnell Douglas* analysis, Pl.'s Br. Opp. at 8, ECF No. 37, and indeed such reason is apparent from the facts of this case: Mr. Evanoski's involvement in any number of performance-related incidents that subjected him to a variety of disciplinary actions. He admitted to a number of them and explained his conduct in relation to a very recent one by stating that he "get[s] lazy" and was "cutting corners." Therefore, the inquiry now turns to the final step of the analysis: whether Plaintiff can demonstrate that the Defendant's legitimate nondiscriminatory reason is a pretext for the real "but for" reason it terminated Plaintiff's employment, his age.

As mentioned above, to make a showing of pretext, Mr. Evanoski must "point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.'" *Burton*, 707 F.3d at 427 (quoting *Fuentes*, 32 F.3d at 764-65). The plaintiff "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence." *Fuentes,* 32 F.3d at 765 (internal quotation omitted). In so doing, he must "do more than show that [the defendant] was wrong or mistaken in deciding to lay him off. He must present evidence contradicting the *core facts* put forward by the employer as the legitimate reason for its decision." *Tomasso v. Boeing Co.*, 445 F.3d 702, 706 (3d Cir. 2006) (internal quotations omitted). It appears that here, Plaintiff proceeds under both *Fuentes* prongs: he both attacks the credibility of Defendant's articulated reasons for his termination, and

offers additional evidence of UPS's alleged discriminatory animus against him. The Court now turns to these arguments.

### 1.  Plaintiff's Performance Incidents

As explained in the Background section above, Mr. Evanoski had a consistent history of performance incidents from 1992 up to his termination in 2011: some twelve incidents before 2011 and three incidents in 2011. *See* Parts I.A, I.B *supra.* For ease of reference, the various incidents, and Plaintiff's explanations of them, are again summarized in table form below (with 2011 incidents also condensed into table form):

| Incident Date | Particulars | Discipline | Plaintiff's Explanation |
|---|---|---|---|
| 3/6/1992 | Refusal to follow instructions | Warning Letter | Admitted |
| 6/6/1997 | Chargeable accident | Warning Letter | Admitted |
| 1/13/1998 | Left package car unattended/unlocked/motor running | Warning Letter | Admitted |
| 12/27/2000 | Missed 60 packages on delivery route | 2 Day Suspension | Admitted |
| 11/15/2001 | Improper conduct with customers in Ellwood City, PA | 5 Day Suspension | Admitted |

| Incident Date | Particulars | Initial Discipline | Post-Grievance Discipline | Plaintiff's Explanation |
|---|---|---|---|---|
| 9/24/2002 | Violence/stalking/threatening | Discharge | Suspension without pay for 33 months; 1st Last Chance Agreement | The other driver involved in the violent altercation hit Plaintiff; Plaintiff did not hit back; other driver not disciplined |
| 12/6/2006 | Amount of "send-agains" and late delivery of air-packages | Warning Letter | N/A | Admitted |
| 6/4/2008 | Missed timely delivery of "Premium Packages" | Warning Letter | N/A | Defendant implemented new delivery service without instructing Plaintiff on its use |
| 12/5/2008 | Left delivery route - drove to his home to retrieve a puppy he | 3 Day Suspension | N/A | Picking up the puppy took only a few minutes; puppy was abandoned; Plaintiff |

| | | | | |
|---|---|---|---|---|
| | started caring for, and brought puppy in his Package Car; did not clock out | | | completed his duties after |
| 4/30/2009 | Accident - struck cement pole in mall parking lot. Damage to Package Car, pole, and on-board device (DIAD) because Plaintiff wrongly kept it on his lap | Discharge | Rescinded; 2nd Last Chance Agreement | Admitted |
| 5/28/2009 | Twice failed to deliver Next Day Air packages | Discharge | Rescinded; 2nd Last Chance Agreement (grouped with 4/30/09 incident) | Packages had not been loaded in the delivery vehicle as was indicated in the DIAD; so many packages in truck Plaintiff unable to locate Next Day Air deliveries |
| 7/9/2010 | Forged customer signature on multiple packages, to make it appear as if they were delivered on time; complaint came from customer | Discharge | 60-day suspension; 3rd Last Chance Agreement | Customer had on multiple occasions before allowed Plaintiff to sign his name; denied he knew of the delivery deadline, due to a new service on which Plaintiff had not been instructed; mall route |
| 1/20/2011 | Hit customer's awning, damaging it, when backing up; did not engage emergency brake. Also failed to engage parking brake while being observed the following day. | Discharge | Discharge | Plaintiff's foot slipped off the brake and onto the gas; emergency brake properly disengaged as he was beginning to move. Regarding observation the following day, he was "flustered" as a result of the accident; mall route |
| 3/8/2011 | Various on-the-job "at risk behaviors" observed: (1) leaving the bulkhead door open, (2) unnecessary backing, (3) park brake not engaged, (4) DIAD on lap, and (5) seat belt not on. | Discharge | Discharge | (1) "I get lazy at the end of the day"; (2) "I set the load up to delivery out of the back door"; (3) "I was pushed for time"; (4) "I'm not denying, I was cutting corners"; (5) "I'm not denying, I was cutting corners."; mall route |

| 4/27/2011 | Failing to report accident and damage to Package Car | Discharge | N/A | Discussed below |
|---|---|---|---|---|

Several salient points emerge from consideration of these incidents:

- Plaintiff does not in any way deny the five incidents that occurred before 2002 that resulted in disciplinary action;
- Plaintiff does not in any way deny the 12/6/06 incident (late delivery of packages);
- Plaintiff does not in any way deny the 4/30/09 incident that was the subject of one of his Discharge Notices, in which he struck a pole, and damaged both the truck and his on-board equipment because he failed to properly secure it;
- Plaintiff does not deny he left his work route to care for his puppy on 12/5/08, but submits that he was not gone for very long;
- Plaintiff does not deny that he was involved with an altercation on 9/24/02 that led to his suspension for 33 months, but submits that he did not strike the other driver;
- Plaintiff does not deny that he failed to deliver packages on time on 6/4/08 and 5/28/09, but submits that they were the result of his failing to receive proper training;
- Plaintiff does not deny that he forged a customer signature on multiple packages on 7/9/10, but submits the customer had permitted him to do it before;
- Plaintiff does not deny that he backed into a customer's awning, damaging it, on 1/20/11, but submits his foot slipped off the brake, and that it was not attributable to him failing to engage the parking brake;
- Plaintiff did not deny his commission of several "At Risk Behaviors" on 3/8/11, admitting that he "get[s] lazy sometimes" and "cut[s] corners";
- These incidents resulted in Mr. Evanoski receiving some seven (7) different Discharge Notices from his employer, four of which were reduced to suspensions accompanied by "Last Chance" agreements or warnings following union grievances, one of which was never considered by the Grievance Committee, and two of which were upheld.
- Mr. Evanoski's final Discharge Notices were unanimously upheld by a joint union/management Grievance Panel.

The picture that emerges from these facts is that Mr. Evanoski unqualifiedly admits to many of the instances of misconduct of which he was accused, and as to the rest of them, he only submits that his misconduct was not so bad in each incident as to warrant the level of discipline he received, or was somehow the result of circumstances outside his control. In other words, the best Mr. Evanoski can offer when it comes to explaining his misconduct, when he offers anything, is "yes, but." Aside from the "yellow paint" episode discussed below that occurred in April 2011, there is not even a remote suggestion that UPS fabricated any of the host of

allegations of misconduct on the part of Plaintiff. When he does blame some of those incidents on circumstances outside his control, he is backed up only by his own self-supporting testimony: e.g., regarding failure to deliver packages in a timely manner, "Defendant implement[ed] a new premium delivery service and [did] not giv[e] Plaintiff any instructions concerning the new service," Pl.'s Resp. CSMF ¶ 12; regarding his altercation with another driver, "Plaintiff did not strike the other driver even after being attacked," *id.* ¶ 11.

At the same time, the record contains ample uncontroverted support for UPS's legitimate, nondiscriminatory reason of terminating Mr. Evanoski: its desire to have employees who operate their cars safely, deliver packages on time, and follow company protocols and procedures. *See* Def.'s CSMF ¶ 4. It is evident that the types of misconduct in which Mr. Evanoski engaged went to the core of his duties as a Package Car Driver. At best, Mr. Evanoski is able to paint his transgressions as not as reprehensible as his employer's opinion of them. But the proper question before this Court is not whether UPS's decision was "wise, shrewd, prudent, or competent," but whether a jury could find that "discriminatory animus motivated the employer." *Id.* at 765. To be sure, *Fuentes* does not require Mr. Evanoski to "rebut *every* proffered reason in order to survive summary judgment," but his rebuttals must render the "defendant's credibility so seriously undermined" in a manner sufficient to "discredit the remainder." *Ball v. Einstein Cmty. Health Associates, Inc.*, 514 F. App'x 196, 200 (3d Cir. 2013) (citing *id.* at 764 n.7)). Mr. Evanoski's evidence, while offering excuses for a few of his instances of misconduct, comes nowhere close to demonstrating such "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" as to make UPS's employment decision in any way unworthy of credence under *Fuentes* prong 1. *Fuentes,* 32 F.3d at 765. Rather, the record shows that Mr.

Evanoski's misconduct occurred as his employer said it did, and that he was given ample opportunities for second, third, and fourth chances from his employer.

## 2. Assignment of Routes; Bus Incident

In addition to trying to find holes in Defendant's reasons for terminating him, Plaintiff also points to two transactions that he argues demonstrate his employer's age-based animus[6] against him: (1) its assigning him to the Mall route instead of his bid route, and (2) the false accusations of him colliding with a school bus.

Mr. Evanoski successfully bid on the 24B route, Downtown Sharon, in early 2010. Pl.'s CSMF ¶ 51. However, on at least a number of occasions, Plaintiff was instead instructed to run the 25A route, the "Mall route." *Id.* ¶¶ 54-56. While Plaintiff continually mentions in his brief and Concise Statement of Material Facts that he was tasked with the Mall route the "majority of the time" instead of his bid route, ECF No. 37 at 6, Pl.'s Resp. CSMF ¶ 44, no record evidence addresses the frequency with which Mr. Evanoski performed the Mall route (not even Mr. Evanoski's deposition). However, Plaintiff was on the Mall route during his incidents on 7/9/10, 1/20/11, and 3/8/11, suggesting he performed that route with at least some regularity. Pl.'s CSMF ¶¶ 54-56. Given that Mr. DiGregorio was not certain of the last time he ran the Mall route – "sometime within the last few weeks, month" – it could be inferred that he currently runs it less often than Mr. Evanoski did. *See* DiGregorio Dep. 15:9. Mr. Evanoski's supervisors opined as to why he might have received that assignment with apparently more regularity than other drivers, but could not testify exactly why. Pl.'s CSMF ¶¶ 58-59; Clark Dep. 17:19-18:6. This is contrasted with the fact that Mr. Gordon did specify exactly why in limited other instances, other drivers sometimes were assigned routes other than their bid routes: they were in training or replacing other absent drivers. *Id.* ¶ 59.

---

[6] The only type of animus material to his claims, or to the disposition of this Motion.

Mr. Hoffman, another Package Car Driver, described the Mall route as "a very tough route to run . . . . it ain't like another route, I don't think," *id.* ¶ 53, though he also testified that it is "a training route where you can put somebody new on it too, because there's not as many streets to know on it . . . because you're right there at the Mall and you have like two other roads to deliver . . . but it's a hustle-bustle route." D's Resp. CSMF ¶ 53. Mr. Barbati stated that in general, "training routes are more difficult regular routes," *id.*¶ 52, and a union representative's statement attributed Mr. Evanoski's failure to wear a seat belt on 1/24/11 to the "distractions of a strange route," *id.* ¶ 57.

According to Mr. Evanoski, UPS assigned him the Mall route instead of his bid route because they "wanted him to make mistakes. They wanted him to fail." Pl.'s Br. Opp. 11, ECF No. 37. But Plaintiff offers no evidence in support of this theory other than his own conjecture. At best, Plaintiff adduces facts from which it could be concluded that it is somewhat unknown why he was assigned a route other than his bid route in a manner unlike that of other drivers at the New Castle Center, a route that may have been more difficult than others, but perhaps not. But those facts do not support an inference that that decision was so unusual, out-of-the-ordinary, or disproportionate as to plausibly be attributable to a desire to "set him up to fail," and to therefore dismiss him because of his age.

Mr. Evanoski also has adduced no record evidence to suggest, for example, that other workers have more incidents when working the Mall route more generally, or more particularly, those types of incidents exhibited by Plaintiff himself on that route: forging customer signatures, colliding with awnings, failing to engage a parking brake, failing to buckle a seat belt, etc. There is also no evidence to suggest that UPS assigned him to the Mall route knowing of some particular inability of Mr. Evanoski to perform the Mall route as compared to any other driver.

And there is no evidence that connects that assignment with any animus against Mr. Evanoski based on his age. Other than inviting raw speculation, the record facts would not allow a reasonable factfinder to infer that because of his age, Mr. Evanoski's employer "set him up to fail" by assigning him the Mall route on multiple, disproportionate occasions rather than to his bid route. Mr. Evanoski simply has not raised a genuine issue of material fact in that regard.

Next, Mr. Evanoski points to the April 2011 "bus yellow paint incident" as evidence of his employer's animus against him. Again, at best, Mr. Evanoski points to a somewhat unclear incident: he states his belief that the yellow paint that was pointed out on his truck the day after his incident with the city bus on April 28, 2011 was "planted" by someone and was not the result of a collision with a school bus. Evanoski Dep. 159, EF No. 31-6. He offers no evidence as to who precisely might have done this or why, or any other evidence of this plot, other than his own conjecture. UPS, in response, does not offer a contrary story for where the paint originated from. Def.'s Resp. CSMF ¶ 60. And again, Mr. Evanoski offers no evidence that this alleged "planting" of evidence against him, even if true, had anything to do with his age.

Mr. Evanoski also asserts that this incident was an unfair and wrongful reason for his discharge. He also asserts, in his defense, that he did not even have to report what he acknowledges did occur – breaking the mirror of his UPS truck – because according to Mr. Evanoski, this is not an "accident" for UPS purposes. Evanoski Dep. at 152. Unfortunately for Mr. Evanoski's argument, the record is clear that the April 2011 incident, and the resulting Discharge Notice, did not factor in any way into his employer's decision to fire him: he was terminated based on the two prior discharge notices of February 4 and March 15, and the Grievance Panel did not consider the April incident at all. *See* Def.'s CSMF ¶ 30, ECF No. 31-7 at 30-31. Therefore, Mr. Evanoski does not, as he must, contradict the "core facts put forward by

the employer as the legitimate reason for its decision." *Tomasso*, 445 F.3d at 706 (emphasis removed). Taking the scant evidence advanced in light most favorable to Mr. Evanoski, he has described at best another unexplained incident that occurred on the job, but not one (either independently or taken along with the route assignment matters) that generates any inference of age discrimination that a rational jury could conclude was the "but for" cause of his termination. *See Keller v. Orix Credit Alliance, Inc.*, 130 F.3d 1101, 1113 (3d Cir. 1997) (for plaintiff to prevail under *Fuentes* prong 2, "a reasonable factfinder [must find that] the proof is sufficient to establish by a preponderance of the evidence that age was a determinative factor[7] in [plaintiff's] . . . termination.").

Thus, Mr. Evanoski's theories relating to his employer's animus against, or unfair treatment of, him are collateral to, and do not undermine, UPS's proffered reasons for his termination, under *Fuentes* prong 1, nor has he adduced evidence that can properly be used to generate an inference of discriminatory animus against him under *Fuentes* prong 2. *See* 32 F.3d at 765.

### 3. **Lack of Other Evidence of Discrimination**

Additionally, not only is the record essentially devoid of any other evidence that could give rise to an inference of age discrimination, but much of that record actually cuts against Plaintiff. First, Mr. Evanoski's termination was unanimously upheld by a Grievance Panel comprised of two union representatives and two UPS representatives, rather than being effected by the unfettered choice of a UPS decisionmaker alone, which weighs against an inference of discrimination by UPS. The fact that Mr. Evanoski was only "replaced" by Mr. DiGregorio by way of a compulsory bidding process under the Labor Agreement, and not by the discretionary

---

[7] *Gross* has since replaced the "determinative factor" standard of causation under the ADEA with the "but for" rule. 557 U.S. at 177-78.

selection of a UPS supervisor, also runs counter to an inference of discrimination. As the Court has discussed above, in the context of Plaintiff's prima facie case, while the fact of replacement (by any means) by Mr. DiGregorio still may be *some* evidence in support of Mr. Evanoski's claims, its weight is exceedingly slight. As to his Mall route assignment, the record evidence of its difficulty is at best mixed, there is little, if any record evidence that such assignments were disproportionate to other route reassignments, and he has offered nothing that connects its supposed difficulty and his age. Further, given the multiple "last chances" Mr. Evanoski was in any event given relative to his numerous incidents on that route, it is difficult to infer that there was any connection between that assignment and a desire to "get him" because of his age.

UPS also offers a number of statistics relating to its employment practices that also weigh against an inference of age discrimination: the fact that the only two other employees who were involuntarily terminated in the five years before Mr. Evanoski were ages 28 and 30, Def.'s CSMF ¶ 41, and the fact that at the time of Plaintiff's termination, 11 of the New Castle Center's 38 package drivers were older than Plaintiff (who was 49), and 28 were over the age of 40, *id.* ¶¶ 39, 40. Contrary to Plaintiff's counsel's assertions at oral argument, courts have consistently affirmed the use of statistical evidence in disparate treatment employment discrimination cases, which while not "dispositive" of the presence or absence of discrimination, "may be helpful." *Bruno v. W.B. Saunders Co.*, 882 F.2d 760, 767 (3d Cir. 1989) (citing *McDonnell Douglas*, 411 U.S. at 804-805; *Int'l Brotherhood of Teamsters v. United States*, 431 U.S. 324, 339 (1977)). Therefore, Defendant has properly offered evidence which indicates the lack of any obvious pattern of discrimination against other older employees on the part of UPS.[8]

---

[8] The Court would reach the same conclusion in this case even in the absence of these proffered statistics, and addresses them only out of completeness to the arguments presented.

Finally, it is worth noting that Mr. Evanoski has produced no evidence of any comparator – a similarly situated person not in his protected class who, although he engaged in certain instances of misconduct, was not disciplined and terminated by UPS similarly to the manner in which he was. *See, e.g., Nguyen v. AK Steel Corp.*, 735 F. Supp. 2d 346, 365 (W.D. Pa. 2010) ("the comparator's misconduct [must] be similar without such differentiating or mitigating circumstances as would diminish his or her conduct or the employer's treatment of such").

Therefore, the record does not contain any other evidence from which an inference of discriminatory animus against Mr. Evanoski on the basis of age could be drawn under *Fuentes* prong 2, and rather, the evidence here, if anything, points 180 degrees in the other direction. *See* 32 F.3d at 765. Plaintiff therefore has not adduced sufficient evidence to meet his burden at step 3 of the *McDonnell Douglas* analysis of demonstrating that UPS's proffered reasons for hiring him were pretextual, and that his age was the "but for" cause of his termination. *Gross*, 557 U.S. at 177-78.

## IV.  CONCLUSION

Mr. Evanoski's case details a well-documented litany of incidents and events which made it abundantly clear that he was not meeting his employer's standards of delivering packages in a safe and timely manner consistent with its protocols. He was given multiple chances to remain in UPS's employ, so long as he continued to conduct himself as a "model employee." When he demonstrated he was unable to do that, he was terminated. Viewed in the light most favorable to him, Mr. Evanoski adduces evidence that some of the several incidents of misconduct for which he was disciplined may not have been as bad as UPS made them out to be, and that certain circumstances of the route he was assigned could have been atypical. But he does not, and cannot argue from the record, that those multiple incidents did not occur, that they did not go to

24

the core of his duties as a Package Driver, and that therefore they were a cover-up for the "real" but-for reason he was terminated, his age. Nor do his allegations relating to his bid route and the April 2011 "yellow paint" incident allow for such an inference. Because Plaintiff has not met his burden of demonstrating a genuine issue of material fact bearing on whether he was discriminated against because of his age, Defendant's Motion for Summary Judgment must be granted.

An appropriate order will follow.

Mark R. Hornak
United States District Judge

Dated: August **30TH**, 2013

cc:    All counsel of record